# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Cr. No. 1:23-CR-209 |
| | : | |
| | : | **(Judge Conner)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| | : | |
| **BRUCE JIN** | : | |

## MEMORANDUM

### I.  Factual Background and Procedural History

This case comes before us on a motion to reconsider the detention order previously entered against the defendant, Bruce Jin. (Doc. 88). With respect to Jin, a federal grand jury returned an indictment[1] finding found probable cause to believe that Jin and others engaged in a sweeping international, transnational money laundering conspiracy and scheme to defraud. (Doc. 6). The extensive and sophisticated scheme outlined in the indictment involved multi-faceted frauds targeting state unemployment compensation systems and COVID relief programs. As outlined in the indictment, Jin played a pivotal role in this far-reaching conspiracy. In the course of this conspiracy, Jin received teller transfers reflecting

---

[1] In this context it is well settled that "an indictment by a grand jury conclusively demonstrates that probable cause exists to implicate a defendant in a crime". United States v. Suppa, 799 F.2d 115, 118 (3d Cir. 1986)

1

fraud proceeds from co-conspirators totaling $1,500,000 per week. In turn, Jin caused more than $35,000,000 in alleged fraud proceeds to be transferred overseas to bank accounts in China. (Id.)

Jin is a United States citizen but was born in China and plainly maintains significant financial ties to that country as evidenced by the more than $30,000,000 in overseas wire transfers which he allegedly made to Chinese bank accounts. Moreover, at the time of his arrest on these charges, Jin engaged in what we found to be a pattern of evasion, concealment, and deception, coupled with what appeared to be a premeditated and calculated effort to prepare for flight. At the time of his arrest, Jin submitted to a pretrial services interview. In that interview Jin acknowledged possession of a U.S. passport but specifically denied possessing any other passports or international travel documents. (Jin PTS Report). Jin also initially expressed a reluctance to discuss his personal finances, but later provided the court and pretrial services with a confused, contradictory and deceptive picture regarding his wealth and holdings. In this interview Jin reported that he had a monthly income of $11,000, savings of $60,000, and monthly expenses of at least $6,000. However, curiously, Jin also reported going to casinos two or three times each week and spending between $5,000 and $10,000 on each gambling excursion. (Id.)

These statements by Jin were riddled with inconsistencies. For example, Jin's account of his weekly gambling expenses cannot be reconciled with his self-reported

2

income and assets. Further, Jin's statement of his financial affairs included no reference to gambling winnings even though Jin stated that he spent in excess of $10,000 a week on gambling. Instead, the government has estimated that Jin's reported gambling losses totaled $400,000, a sum which far exceeded Jin's self-reported income and assets, creating an unmistakable inference that Jin has access to some otherwise unexplained sources of wealth. (Doc. 74, at 15). Further, none of these statements could be reconciled with the indictment's allegations that Jin received up to $1,500,000 on a weekly basis and transferred some $35,000,000 overseas.

Jin's denial that the possessed other passports also proved to be demonstrably false. When agents searched Jin's home following his arrest, they found a Mexican passport with Jin's photograph, which had been issued under an alias, concealed in a dryer. Moreover, cell phone GPS data placed Jin's cell phone at the Mexican Consulate days before his arrest.

On these facts, Jin was detained at his initial appearance in federal court in California as a flight risk. (Doc. 26). Jin then filed a motion with the district court challenging this detention decision. (Doc. 59). Following a hearing on his request, Jin's motion for release pending trial was denied, the district court finding that:

> The Government has established that Mr. Jin repeatedly lied to pretrial services, most notably involving his possession of a Mexican passport which he procured just three days before his arrest using a pseudonym and while falsely representing himself as a Mexican national by birth.

3

> Mr. Jin presented false information to Magistrate Judge Eick as well in an effort to justify his procurement of the fake passport. (Interpreter translating.) There is only one purpose in obtaining a fraudulent passport under a pseudonym, and that is to be able to travel internationally under a fake identity so that one's whereabouts become untraceable. (Interpreter translating.) This passport was secreted in a clothes dryer. (Interpreter translating.) Clearly it was placed there to avoid detection by law enforcement or other individuals, and his proffered explanation makes no sense and is not credible with respect to a concern over his roommate's discovery of the same. (Interpreter translating.) It is also clear that Mr. Jin is comfortable traveling to Mexico and China. He clearly has substantial overseas ties to both places. That's evidenced by the exhibits in the record produced by the Government, including his travel by vehicle to and from Mexico and his travel, extensive travel, and extensive living experience in China. (Interpreter translating.) He lives less than four hours by car from the Mexican border and recently engaged in travel there, including one time by foot. And he resided in China, a country that shares no extradition treaty with the United States, at various points from 2012 to 2019 and perhaps thereafter and was comfortable enough with his contacts there to send money, much of which is the subject of the underlying indictment. (Interpreter translating.) In short, this is a classic case for pretrial detention based on a risk of nonappearance, given the passport, the financial means, and a comfort with international travel that Mr. Jin has enjoyed. And for all of those reasons, I find by a preponderance of the evidence that Mr. Jin poses a serious flight risk and that there are no conditions or combination of conditions short of confinement that will reasonably assure his appearance at trial. The motion for release pending trial is denied.

(Doc. 74, at 46-48).

Jin, who is now represented by new counsel, has filed a motion to reconsider this detention decision, (Doc. 88), which has been referred to the undersigned. In this motion defense counsel:

> [R]equests this Court to reconsider its September 21, 2023 Order because new information exists and a combination of conditions can be

set which will "reasonably assure" Mr. Jin's appearance in court, including but not limited to:

a) Mr. Jin's adjustment to confinement has been exemplary: he has been in custody for more than one year without a single infraction and he has been a model inmate. See Exhibit 1 to accompanying brief.

b) Global Positioning Satellite (GPS) Monitoring will provide the Court with real-time, 24-hour location monitoring, which will allow the Probation Office to monitor Mr. Jin's compliance with home incarceration.

c) GPS Monitoring, combined with strict conditions such as: home incarceration, computer/electronic device registration and monitoring, prohibition on contact with individuals outside of the United States, prohibition of possession of international travel documents, pre-trial services supervision, and undersigned counsel's submission of all travel arrangements to United States Probation will reasonably assure Mr. Jin's appearance in court.

(Id., at ¶ 5).

The parties are in accord that the factual record in this case is fully developed, and no further hearing is necessary with respect to this motion. The motion is also fully briefed and is, therefore, ripe for resolution.

While we commend counsel for the skill of their presentation, for the reasons set forth below, this motion to reconsider will be denied.

## II.    Discussion

The legal standards which govern motions to reconsider in criminal cases are familiar ones.

> Although not specifically provided for in the Federal Rules of Criminal Procedure, "motions for reconsideration may be filed in criminal

cases." United States v. Fiorelli, 337 F.3d 282, 286 (3d Cir. 2003). In a criminal case, a motion for reconsideration is adjudicated using the same standards utilized for civil motions for reconsideration. Id.; see also United States v. Hill-Johnson, 806 F. App'x 114, 119 (3d Cir. 2020); United States v. Moore, No. 08-cr-730, 2021 WL 4860734, at *1 (E.D. Pa. Oct. 19, 2021); United States v. Suggs, No. 19-cr-134, 2021 WL 4460024, at *4 (W.D. Pa. Sept. 29, 2021); United States v. King, No. 16-cr-321, 2017 WL 3087745, at *2 (M.D. Pa. July 7, 2017).

The purpose of a motion to reconsider "is to correct manifest errors of law or fact or to present newly discovered evidence." Harsco Corp v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985). "[A] judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in controlling law; (2) the availability of new evidence that was not available when the court granted the motion [ ]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." Max's Seafood Cafe v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).

As the Third Circuit has noted, the scope of a motion for reconsideration is "extremely limited" and a party may not use the motion to relitigate issues the court already decided. See Blystone v. Horn, 664 F.3d 397, 415 (3d Cir. 2011); United States v. Dupree, 617 F.3d 724, 732-33 (3d Cir. 2010) ("Though motions to reconsider empower the court to change course when a mistake has been made, they do not empower litigants ... to raise their arguments, piece by piece.") (internal quotation marks omitted).

United States v. Novikov, No. CR 11-189, 2022 WL 9635105, at *2 (E.D. Pa. Oct. 17, 2022).

In this case, Jin asks us to reconsider prior court orders directing that he be detained pending trial as a risk of flight. In this regard, the Bail Reform Act specifically authorizes pretrial detention of flight risks, providing that:

**(e) Detention.--(1)** If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition

>   or combination of conditions will reasonably assure the appearance of the person as required . . ., such judicial officer shall order the detention of the person before trial.

18 U.S.C. § 3142(e).

Under the Act, this risk of flight determination is made by a preponderance of the evidence, United States v. Himler, 797 F.2d 156, 161 (3d Cir. 1986), and entails an informed evaluation of: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; and (3) the history and characteristics of the person. 18 U.S.C. § 3142 (g). In making this determination, the courts have historically considered various forms of evidence as badges of flight. Thus, "[r]elevant factors that support a serious risk finding include the use of a number of aliases, unstable residential ties to a community, efforts to avoid arrest, or hidden assets. Evidence of a serious intent to flee the country in response to an indictment also justifies detention as a serious risk of flight." United States v. Giordano, 370 F. Supp. 2d 1256, 1264 (S.D. Fla. 2005). Applying these benchmarks it has been held in fraud cases that detention is justified based upon flight risk, when the defendant is charged with financial crimes resulting in millions of dollars of losses, has significant foreign connections, substantial international travel experience, and has a proven ability to create and use false identities. United States v. Gentry, 455 F. Supp. 2d 1018, 1033 (D. Ariz. 2006). See e.g., United States v. Abdurahman, 107 F. Supp. 3d 992, 996 (D. Minn. 2015) (detention based in part

upon attempt to obtain forged travel documents); United States v. Hunter, No. 13-CR-521-LTS, 2014 WL 6632965, at *2 (S.D.N.Y. Nov. 24, 2014) (denying motion to reconsider detention when false passports found in the defendant's home); United States v. Cole, 715 F. Supp. 677, 678 (E.D. Pa. 1988) (use of false names and access to passports justifies detention).

So it is in the instant case. Bruce Jin is charged in an indictment with financial crimes which are staggering in the sophistication and breathtaking in terms of their financial dimension. It is alleged that Jin facilitated the laundering of more than $30,000,000 in fraud proceeds into overseas Chinese bank accounts. Thus, Jin, who was born in China, has significant financial ties outside the United States, financial ties which the grand jury has determined were forged through fraud. Jin also has international travel experience, and his past descriptions of his personal finances raise profound flight concerns since these statements strongly suggest that Jin's finances are a riddle, shrouded in mystery and wrapped in an enigma.

While these factors alone would support a risk of flight determination, the fact that Jin lied to federal officials at the time of his arrest about his acquisition and possession of a false Mexican passport issued under an alias confirms that he presents a grave risk of flight. This undisputed evidence is troubling and fully supports Jin's detention in at least three respects. First, Jin's acquisition of this false passport in the days immediately preceding his arrest is emblematic of calculated,

8

premeditated planning. Second, Jin's possession of this false passport is a clear and irrefutable badge of flight. As the district court previously observed: "There is only one purpose in obtaining a fraudulent passport under a pseudonym, and that is to be able to travel internationally under a fake identity so that one's whereabouts become untraceable." Finally, Jin's apparent willingness to lie about his possession of this fake passport reveals a degree of mendacity towards the court which thoroughly undermines any reliance that we could place upon his promises to appear as required.

While Jin argues that his compliance with the current conditions of his confinement demonstrates that he could be released, we disagree. The fact that Jin has not been a disruptive detainee tells us nothing about the risk of flight he would present if released. Rather, Jin has spoken eloquently to this risk of flight through his conduct prior to being ordered detained, conduct that included secreting millions of dollars overseas; lying to federal authorities; and concealing a fraudulent passport.

Jin also argues that his compliance with court ordered electronic monitoring would sufficiently mitigate any potential flight risk. However, it is well settled that:

> Electronic monitoring impedes but does not prevent a defendant from fleeing. See United States v. Orena, 986 F.2d 628, 632-33 (2d Cir.1993); United States v. Gotti, 776 F.Supp. 666, 672-73 (E.D.N.Y.1991). See also United States v. Benevolence International Foundation, supra, 222 F.Supp.2d at 1007 (electronic surveillance systems can be circumvented and the monitoring equipment can be rendered inoperative; electronic monitoring does not stop a person from fleeing).

United States v. Abdullahu, 488 F. Supp. 2d 433, 444 (D.N.J. 2007); United States v. Vargas, No. 13-2044 JS, 2013 WL 3223419, at *5 (D.N.J. June 25, 2013). In this case, given Jin's apparent criminal sophistication, his manifest financial ties overseas, the extent of his past flight planning, and the demonstrated degree of his past deceits we conclude that a promise by this defendant to comply with electronic monitoring, which would only impede flight, is inadequate to overcome the specific and detailed flight risk finding made by the district court.

    Simply put, no grounds exist to reconsider this detention decision. Jin has not identified any intervening change in the law which mandates his release. Nor has he shown the need to correct a clear error of law or fact in order to prevent manifest injustice. Finally, the new evidence cited by Jin does not alter the quantum of proof which strongly supports Jin's continued detention. Accordingly, this motion to reconsider will be denied.[2] An appropriate order follows.

                                                                     */s/ Martin C. Carlson*
                                                                     Martin C. Carlson
                                                                     United States Magistrate Judge

DATED: October 22, 2024.

---

[2] While we deny this motion we commend Jin's counsel for their diligence in this matter, diligence which we are sure will serve Jin well as this case proceeds forward. We also commend the Government for its comprehensive presentation.